UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES J. FUHRMAN,

      Plaintiff,

vs.                             Case No. 19-cv-000783

UNITED OF OMAHA LIFE          Hon. Robert J. Jonker
INSURANCE COMPANY,         Magistrate Judge Ray Kent

      Defendant.

---

| | |
|---|---|
| Troy W. Haney (P48614) | James E. Brenner (P11178) |
| Attorney for Plaintiff | Mark W. McInerney (P29077) |
| HANEY LAW OFFICES, P.C. | Attorneys for Defendant |
| 330 East Fulton Street | CLARK HILL PLC |
| Grand Rapids, MI 49503 | 500 Woodward Avenue, Suite 3500 |
| 616-235-2300 | Detroit, MI 48226 |
| thaney@troyhaneylaw.com | 313-965-8300 |
| | jbrenner@clarkhill.com |
| | mmcinerney@clarkhill.com |

---

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD AND TO REVERSE THE PLAN ADMINISTRATOR'S
DECISION**

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES ..................................................................................................iv

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS .........................................................................................................2

STANDARD OF REVIEW .......................................................................................................15

ANALYSIS ..........................................................................................................................16

    I.    Plaintiff Fulfilled the Requirements for Disability Under the LTD Plan. ..........................16

    II.   Plaintiff Fulfilled the Requirements for Total Disability Under the LWOP Plan................18

    III.  Defendant's Decision to Ignore the Opinions of Plaintiff's Attending Physicians in Favor of Paper Record Reviews Was Improper. ............................................................19

    IV.  Defendant Failed to Give Proper Weight to the Social Security Administration's Finding of Total Disability. ...........................................................................................23

    V.   Defendant Failed to Properly Investigate the Claim. ...........................................................25

    VI.  Defendant Failed to Consider the Work Skills and Income Requirements Necessary to Satisfy the Definition of Disability Within the LTD Plan. ...................................25

CONCLUSION AND RELIEF ...................................................................................................27

CERTIFICATE OF COMPLIANCE ..........................................................................................28

# INDEX OF AUTHORITIES

Cases                                                                                          Page

*American Counsel of Life Insurers v. Ross*,
    558 F.3d 600 (6th Cir. 2009) ...........................................................................16

*Bennett v. Kemper Nat'l Servs.*, Inc.,
    514 F.3d 547 (6th Cir. 2008) ...........................................................................20

*Calvert v. Firstar Fin., Inc.*,
    409 F.3d 286 (6th Cir. 2005) ......................................................................20, 22

*Cannon v. Harris*,
    651 F.2d 513 (7th Cir. 1981) ...........................................................................25

*Counts v United of Omaha Life Ins Co*,
    429 F Supp 3d 389 (ED Mich, 2019) ...............................................................18

*Elliott v Metro Life Ins. Co.*,
    473 F3d 613 (6th Cir. 2006) ............................................................................27

*Evans v. Unum Provident Corp.*,
    434 F.3d 866 (6th Cir. 2006) ...........................................................................20

*Firestone Tire & Rubber Co. v. Bruch*,
    89 U.S. 101 (1989) ...........................................................................................15

*Guest-Marcotte v. Life Ins. Co. of N. Am.*,
    730 F App'x 292 (6th Cir. 2018) ......................................................................26

*Hoover v. Provident Life and Accident Ins. Co.*,
    290 F.3d 801 (6th Cir. 2002) ...........................................................................19

*Javery v Lucent Technologies, Inc Long Term Disability Plan for Mgt or LBA Emples*,
    741 F3d 686 (6th Cir. 2014) ......................................................................20, 24

*Marquette General Hospital v. Goodman Forest Industries¸*
    315 F.3d 629 (6th Cir. 2002) ...........................................................................16

*Perry v. Simplicity Engineering*,
    900 F.2d 963 (6th Cir. 1990) ...........................................................................16

*Quinn v. Blue Cross & Blue Shield Ass'n*,
    161 F.3d 472 (7th Cir. 1998) ...........................................................................27

*Shaw v. AT & T Umbrella Ben. Plan No. 1*,
    795 F.3d 538 (6th Cir. 2015) ...........................................................................20

*Smith v. Bayer Corp. Long Term Disability Plan*,
    275 F. App'x 495 (6th Cir. 2008) ...............................................................................20

*Tiedel v. Reliance Std. Life Ins. Co.*,
    ___F Supp 3d___; 2020 U.S. Dist. LEXIS 65982 (WD Mich, Apr. 15, 2020)..........................21


<u>Statutes</u>                                                                                              <u>Page</u>

29 U.S.C. 1001 ..............................................................................................................1

42 U.S.C.S. § 423 .......................................................................................................10

Mich. Admin. Code R 500.2202 ................................................................................16


<u>Websites</u>                                                                                              <u>Page</u>

Ethical Principles of Psychologists and Code of Conduct, American Psychological Association,
    https://www.apa.org/ethics/code/ethics-code-2017.pdf................................................14

Ethics, American Psychiatric Association,
    https://www.psychiatry.org/psychiatrists/practice/ethics ...........................................14

Picture of the Carotid Artery,
    https://www.webmd.com/heart/picture-of-the-carotid-artery#1 ...................................2

## <u>STATEMENT OF THE ISSUES</u>

1.    Is the Plaintiff disabled as defined by the Long Term Disability Plan and Life Insurance Plan, and as supported by the documents available in the Administrative Record?

    Plaintiff's answer: Yes.

2.    Did the Plaintiff's disability from his regular occupation continue through the Long Term Disability Elimination Period, and into the period of time that would qualify him for benefits?

    Plaintiff's answer: Yes.

3.    Did the Plaintiff's total disability from any work continue through the Life Waiver of Premium Elimination Period, and into the period of time that would qualify him for Life Waiver of Premium benefits?

    Plaintiff's answer: Yes.

## INTRODUCTION[1]

At all relevant times, Charles Fuhrman ("Plaintiff") was a participant in a group welfare long term disability plan ("the LTD Plan"), group policy no. GLTD-AEMS; and a group welfare life insurance plan ("the Life Plan"), group policy no. GLUG-AEMS, both of which were provided by SAF-Holland, Inc. Both Plans are subject to the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001 *et seq*. The Defendant, United of Omaha Life Insurance Company ("Defendant"), is the claims administrator and named fiduciary for benefit claims under both Plans and determines whether participant benefit claims are payable through group insurance underwritten by Defendant.

Plaintiff was initially considered to be disabled, as defined by the LTD Plan, starting on December 19, 2017. In order to qualify for long term disability ("LTD") benefits, the Plan required Plaintiff to be disabled through a 180-day "Elimination Period", which ended on June 16, 2018. On September 9, 2018, Defendant informed Plaintiff that it no longer considered him to be disabled as of February 17, 2018, and therefore, because he was not disabled through the Elimination Period, his claim for LTD benefits was denied. Simultaneously, with the full expectation that he qualified for LTD benefits, Plaintiff had also applied for "life waiver of premium" ("LWOP") benefits under the terms of the Life Plan. However, due to Defendant's erroneous decision that Plaintiff was no longer disabled as of February 17, 2018, Defendant informed Plaintiff on November 28, 2018 that his claim for the LWOP benefits had also been denied.

On February 28, 2019, Plaintiff submitted an administrative appeal of Defendant's decision to deny both LTD and LWOP benefits. On June 17, 2019, Defendant responded by

---

[1] Citations herein are referenced by the docket entry number and the Page ID numbers assigned by the CM/ECF filing system.

1

affirming its decision to deny all benefits and notified Plaintiff of his right to file suit under section 502(a) of ERISA. Plaintiff now challenges Defendant's final determination, demonstrating that the decision was in violation of the Plans, and contrary to the compelling medical evidence of disability in the Administrative Record.

## STATEMENT OF FACTS

Plaintiff Charles Fuhrman is a fifty-seven (57) year-old man, born September 29, 1963. Plaintiff has a Bachelor of Science in Management and was also a Petty Officer 2nd Class in the United States Navy. ECF 22-2, PageID.629. In December 1996 he began full-time employment with SAF-Holland, Inc. as a Business Unit Financial Analyst ("Financial Analyst"). *Id.* Plaintiff's responsibilities in that position have been summarized as,

> analyzes sales, cost of sales, margins, sales and administration expenses across SAF-Holland, Inc. Provide analysis of variances from financial plan and make corrective action recommendations to Financial Planning & Analyst Manager and respective department leaders. Regularly collaborates with management team, marketing department, and engineering on pricing and target costing of products. *Id.* at PageID.635.

The responsibilities of a Financial Analyst are complex and require a significant ability to multi-task, analyze financial reports and communicate with company officials at the highest levels to ensure the efficiency, competitive advantage, and overall financial health of the company.

On November 30, 2016, Plaintiff woke up in the morning experiencing numbness and tingling in his left arm and face. He was subsequently diagnosed with a Cerebrovascular Accident ("CVA", aka "stroke") and further diagnostic evaluation revealed that his right carotid artery was 100% blocked, and his left carotid artery had up to 39% blockage[2]. ECF 22-3, PageID.935-37. Due to well-documented symptoms, Plaintiff was forced to stop working and focus on recovery. In January 2017, Plaintiff attempted to return to work but immediately began

---

[2] The carotid arteries are major blood vessels in the neck that supply blood to the brain, neck, and face. There are two carotid arteries, one on the right and one on the left. (https://www.webmd.com/heart/picture-of-the-carotid-artery#1).

to notice difficulties with concentration, focus, and his general ability to keep up with his extensive complex job duties. Despite his daily struggles, Plaintiff continued working for a period hoping that further recovery might provide additional vocational gains.

Plaintiff's struggles continued to the point where on September 5, 2017, he reported to the Emergency Department at Mercy Health Mercy Campus, where the medical records state, "*[history of] CVA, right carotid artery occlusion, anxiety, and [hypertension] presenting to the [Emergency Room] for worsened numbness and tingling of his left arm. The intensity has increased to the degree that he is unable to function at work or complete tasks at home*". ECF 22-1, PageID.462.

On December 13, 2017, Plaintiff saw his primary care physician, Dr. Matthew Powell, wherein the medical record states in part,

> **Reason for Appointment:** …tired all the time [symptoms] about a year now.
>
> **Assessment:**
> 1. Dysesthesia of multiple sites
> 2. Obstructive Sleep Apnea
> 3. Depression with anxiety
> 4. Attention and concentration deficit
> 5. Fatigue
> 6. Labile hypertension
>
> **Neurologic:** …Admits balance difficulty, SOMEWHAT DISORIENTED AT TIMES.
>
> **Psychiatric:** FOCUS IS AN ISSUE. SOMETIMES IT IS ALL I CAN DO TO GET THROUGH THE WORK WEEK. Admits anxiety, GET OVERWHELMED, LOSE FOCUS. (Emphasis in original). ECF 22-2, PageID.254-56.

On December 17, 2017, Plaintiff slipped and fell on icy steps, hitting his head and sustaining a T8 vertebral fracture. *Id.* at PageID.858-60. As a result, Plaintiff was again forced to stop working, initially due to symptoms from his back injury, but as his physical symptoms began to subside, he came back to the realization that he was simply not able to return work due to the persistent ongoing cognitive symptomatology secondary to his 2016 stroke and his occluded carotid arteries. In other words, as his spinal fracture healed, he returned to the

declining status recorded by Dr. Powell on December 13th as noted above. Plaintiff's diagnosed medical conditions are as follows:

- Bilateral Deep White Matter Lesions, multiple; (ECF 22-4, PageID.1206)
- Carotid Artery Occlusion (ECF 22-3, PageID.935-37)
  - Right: 100%;
  - Left: 39%
- Cervicalgia; (ECF 22-4, PageID.1265)
- Cervical Radiculopathy; (ECF 22-4, PageID.1265)
- Dysesthesia; (ECF 22-5, PageID.1316)
- Hypertension; (ECF 22-6, PageID.1579)
- Hypersomnolence; (ECF 22-6, PageID.1591)
- Obstructive Sleep Apnea, with "CPAP" machine; (ECF 22-6, PageID.1549)
- Paresthesia, left side; (ECF 22-5, PageID.1270)
- Polyneuropathy, Demyelinating and Axonal; (ECF 22-7, PageID.1660)
- Psychomotor Deficits following CVA; (ECF 22-14, PageID.2140)
- Sensorineural Hearing Loss; (ECF 22-16, PageID.2610)
- Stenosis (ECF 22-16, PageID.2699)
  - Spinal
  - Foraminal, moderate to extremely severe
- Status Post Cerebrovascular Accident; (ECF 22-18, PageID.3124)
- Status Post T8 Vertebral Fracture; (ECF 22-18, PageID.3124)
- Tinnitus, bilateral; (ECF 22-19, PageID.3312)
- Transient Neurological Symptoms; (ECF 22-5, PageID.1270)
- Anxiety, due to medical conditions; (ECF 22-2, PageID.230-31)
- Depression, due to medical conditions. (ECF 22-2, PageID.230-31)

Due to the overflow of symptomatology from Plaintiff's diagnosed medical conditions, Plaintiff experiences daily headaches, dysesthesias, fatigue, poor recall, difficulty with concentration and focus for prolonged periods, and cannot perform complex mental tasks requiring rapid recall. ECF 22-20, PageID.3957. In short, his symptoms go to the very heart of his "own occupation" job duties.

One of the requirements of the LTD Plan is that Plaintiff must complete a 180-day Elimination Period before becoming eligible for LTD benefits. ECF 22-1, PageID.106. During

the Elimination Period, Plaintiff's back injury began to heal, but his ongoing symptoms from his stroke and occluded carotid arteries continued to worsen. This unfortunate trajectory should not be surprising based on the medical documentation recorded just days before Plaintiff slipped on ice injuring his back. On February 16, 2018, Plaintiff saw his orthopedic physician, Dr. Mark Moulton who charted:

> I would like to have Charlie start weaning from the brace. He is nearly completely asymptomatic at this point and would strongly recommend increasing his level of activity after he has been weaned from the brace. He may return to work at this point. ECF 22-4, PageID.1171.

Thus, Plaintiff's back injury continued to improve, and he was cleared to return to work from an orthopedic standpoint, but his cognitive functioning continued on a downward trajectory. Medical records from the following months document Plaintiff's decline:

**February 27, 2018 – Dr. Matthew Powell**
1. [Patient request] FMLA form.

2. ONGOING TINGLING OF SKULL/BRAIN CONSTANTLY, FACE AND LEFT ARM INTERMITTENTLY. HEADACHES INTERMITTENTLY, SUFFER FROM SIGNIFICANT ANXIETY, DEPRESSION AND LACK OF MOTIVATION/ENERGY.

NEUROLOGIC: …He seems to struggle to maintain focus and recall certain facts that his wife helps him with.

**Treatment: …2. Sequela of cerebrovascular accident**
…depression, anxiety, indecision, lack of concentration, headaches, dysesthesias, fatigue. These sequelae, from a medical perspective, are disabling this patient from work at this time. ECF 22-5, PageID.1315-16.

**March 13, 2018 – Dr. Matthew Powell**
…Still feeling fatigued. Hard to stay awake.

Neurologic: Focus is still off variably. Days are unpredictable in ability to perform ADLs, Perhaps some mild improvement. Admits balance difficulty. Still off balance frequently, affecting coordination… Admits memory loss, hard to concentrate, focus, dysphoric during driving sometimes. Admits tingling/numbness in the face has been less. Still common in the skull, back of head. Left arm paresthesia. ECF 22-7, PageID.1634-36.

**March 21, 2018 – Dr. Jacobus Donders – Neuropsychological Evaluation**
The symptoms of numbness and tingling never really completely went away. In addition, Mr. Fuhrman found himself having difficulties at work as a financial analyst when working with spread sheets. He experienced lack of focus and became easily overwhelmed. His physical symptoms became increasingly distracting and upsetting to him. In September of last year, he "lost it" and ended up going to the ER. That prompted the trial of psychotropic medication.

Mr. Fuhrman indicated that he is still often fatigued and frustrated. He tends to get "stuck" during projects. * * *

There were a few occasions where there were some minor inefficiencies. Mr. Fuhrman struggled on the first trial of a test of verbal fluency under time pressure (D-KEFS). It was clear that he was experiencing a psychogenic "block". His eyes got really big, and he started shaking his head. * * *

All of these findings suggest that there may have been a slight reduction in *efficiency* of processing as the result of the stroke. However, this appears to be augmented or amplified considerably by Mr. Fuhrman's emotional reactivity. In other words, he notices that he is not doing 100% well, gets frustrated and, then gets stuck. * * *

The second notable aspect of the validity configuration was a low K index (T score of 31). That was strongly suggestive of a paucity of adaptive coping skills. With those considerations in mind, the clinical profile was suggestive of a man who has significant physical symptoms as well as an at least mild degree of depression. * * *

**Impression/Recommendations:** Mr. Fuhrman has some residuals that are directly related to his stroke. They include some sensory-motor incoordination with the nondominant left hand, as well as a mild overall reduction in efficiency of cognitive processing… He tends to get very frustrated and overwhelmed. When he gets "stuck", the hard he tries, the worse things get. * * *

In terms of return to work, I would delay that until a decision has been made with regard to how to treat Mr. Fuhrman with which specific medications… I would suggest that he initially go back on a half-time basis. I would also caution against any type of trying to "overcompensate". ECF 22-5, PageID.1325-1331.

### April 10, 2018 – Dr. Matthew Powell
**Treatment**
**1.  Psychomotor deficit following cerebral infarction**
Notes: Spent 20 minutes reviewing neuropsych evaluation. They recommend continue off work until medical management is stable and counseling has been resumed. ECF 22-14, PageID.2140-41.

### April 23, 2018 – Cheryl Kallio, MA
Client and counselor explored acceptance that his brain has been injured and it doesn't function the same way as it did before.

Client and counselor discussed how he does alright with some tasks, though still difficult to stay focused, but that when it comes to tasks dealing with his job, disability, and finances he is struggling because this means he would have to accept where he [is] at and this is scary to him.

Client and counselor discussed how the client's inability to stay on task seems to be related to both the brain injury in addition to being exacerbated by the emotional state of accepting his life is changed.

Client discussed how focusing on some things for more than an hour to an hour and a half makes him extremely tired and he needs to take a nap. ECF 22-14, PageID.2200.

As the 180-day Elimination Period neared completion, Plaintiff applied for LTD benefits

pursuant to his group LTD Plan on May 4, 2018. ECF 22-2, PageID.626-38. Although Plaintiff

6

initially stopped working due to his intervening back injury, his application for LTD benefits was not based on physical restrictions and/or limitations, but rather on his decline in cognitive functional capacity that persisted from his stroke and occluded carotid arteries. *Id.*

The LTD Plan's definition of disability states:

*Disability* and *Disabled* mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which:

   a)  During the Elimination Period, You are prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

   b)  After the Elimination Period, You are:

      1.  Prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

      2.  Unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

After a Monthly Benefit has been paid for 2 years, *Disability* and *Disabled* mean You are unable to perform all of the Material Duties of any Gainful Occupation.

Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with the Policyholder. ECF 22-1, PageID.124.

The definition of "Material Duties" states:

means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than the required Full-Time hours per week in itself to be a part of material duties. **One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis.** *Id.* at 125. (Emphasis added).

Due to the well-documented changes in Plaintiff's cognitive functioning, he was, and continues to be, **unable to perform <u>any</u> of the material duties of his regular occupation on a full-time basis**, which also means he is unable to generate earnings that exceed 99% of his basic monthly earnings, and he therefore fits well within the definition of "Disabled".

Plaintiff's 180-day Elimination Period ended on June 17, 2018, and LTD benefits should have started on June 18, 2018. However, Defendant alleged that it had not yet completed its review of Plaintiff's claim for LTD benefits.

On June 29, 2018, Plaintiff submitted a "Waiver of Premium Claim Form" to Defendant, requesting that the premiums for his life insurance coverage be waived due to his disability. ECF 22-20, PageID.3952-57. This benefit is commonly referred to as "Life Waiver of Premium", or "LWOP". The Life Plan's definition of disability states:

> *Total Disability, Totally Disabled* means that because of Injury or Sickness You are completely and continuously unable to perform any work or engage in any occupation. ECF 22-15, PageID.2499.

At the time Plaintiff stopped working, he possessed $154,000 in Basic life insurance coverage, and an additional $100,000 in Voluntary life insurance coverage. *Id.* at 3952. Included as part of the LWOP Claim Form was an Attending Physician Statement from Dr. Powell, dated June 29, 2018, and which stated in part,

> **Symptoms:** Headaches, dysesthesias, fatigue, poor recall, difficulty with concentration and focus.
>
> **Limitations:** Focus or concentrate for prolonged periods, perform complex mental tasks requiring rapid recall.
>
> **Restrictions:** Mental processing & concentration.
>
> **Is the patient now TOTALLY disabled from PRESENT occupation?** Yes. ECF 22-20, PageID.3957.

Dr. Powell also concluded that Plaintiff's prognosis for recovery is "poor", that he has already achieved "maximum medical improvement", and that his expectation regarding a future return to his prior level of functioning was listed as "never". *Id.*

On August 10, 2018, during the process of reviewing Plaintiff's LTD and LWOP claims, Defendant requested Michael Anderson, a Vocational & Rehabilitation Specialist, complete an Occupational Analysis for the position of Financial Analyst. ECF 22-16, PageID.2574-75. In Mr. Anderson's report he summarizes the material duties of a Financial Analyst and categorizes the physical demands characteristics of the position as "sedentary exertion level", and provided a detailed description of the requirements of a sedentary position, but at no point within the report

does he make any effort to describe or analyze the education, training, or cognitive functional capacity required to perform this position, which is the essence of Plaintiff's entire disability claim. *Id.*

Both the LTD Plan and the Life Plan also include a provision that provides the Defendant the right to have participants undergo an independent medical examination, stating in the respective plans,

> **LTD PLAN**
> We may occasionally require You to be examined by a Physician or vocational rehabilitation expert of Our choice to assist in determining whether benefits are payable. ECF 22-1, PageID.120.
>
> **LIFE PLAN**
> In order to confirm that You are Totally Disabled, We have the right to have You examined by a Physician of Our choice at our expense. ECF 22-15, PageID.2505.

Despite this right, at no time during the claims and appeal process did Defendant ever exercise this right as part of its investigation of Plaintiff's claim for LTD and LWOP benefits.

On September 9, 2018, Defendant denied Plaintiff's claim for LTD benefits, stating in part,

> Based on the information in the file, your last day worked as a Business Unit Financial Analyst for SAF-Holland, Inc. was December 18, 2017, and you are claiming disability beginning December 19, 2017, for cerebral infarction, sequelae of stroke, major depression and cephalgia. * * *
>
> The physical demand characteristics of this occupation generally fall within the sedentary exertion level, which is defined as exerting up to 10 lbs. of force occasionally and a negligible amount of force frequently to lift, carry, push or otherwise move objects. Sitting is required frequently to constantly with occasional or intermittent standing/walking. * * *
>
> In summary, our review found you would have been precluded from your regular work activities from your last day worked through February 16, 2018, while you were being treated for the wedge compression fracture of T7-T8, which involved wearing a brace and pain management. Dr. Moulton released you to return to work during your office visit on February 16, 2018; therefore, from February 17, 2018, going forward the records fail to substantiate any restrictions and limitations that would preclude you from performing the material duties of your regular occupation. * * *
>
> As your elimination period extended from December 19, 2017 to June 17, 2018, you failed to satisfy this provision under the policy. Therefore, no benefits are payable and your claim has been denied. ECF 22-18, PageID.3210-21.

Therefore, without properly considering Plaintiff's cognitive ability to perform his position on a full-time basis; without ever having asked the Plaintiff to undergo any independent medical evaluations; and without ever having a single physician review Plaintiff's claim or medical records, Defendant denied Plaintiff's claim for LTD benefits.

Had the Defendant approved Plaintiff's disability status, the 9-month Elimination Period required for LWOP benefits from the Life Plan would have been completed on September 18, 2018. ECF 22-15, PageID.2505. Instead, on November 28, 2018, Defendant denied Plaintiff's claim for LWOP benefits, stating in part,

> We reviewed the medical records from your treating physicians and found no documented severe mental or physical restrictions or limitations that would prevent you from performing sedentary level work. Based on the results of the review, the records received do not support restrictions and limitations from sedentary level work. Therefore, you do not meet the definition of total disability according to the provisions of the plan. ECF 22-15, PageID.2437.

Once again, Defendant's denial was based on Plaintiff's capability to perform physically, with zero consideration for Plaintiff's inability to perform full-time work due to his well-documented cognitive deficits, and more to the point, his inability to execute the complex detail oriented occupational duties of a Financial Analyst.

During the process of applying for LTD and LWOP benefits, Plaintiff also applied for Social Security Disability ("SSD") benefits. On January 23, 2019, the Social Security Administration ("SSA") issued a Disability Determination Explanation approving Plaintiff for SSD benefits. ECF 22-2, PageID.525-99. The statutory definition of disability under the SSA is,

> **the inability to engage in any substantial gainful activity (SGA) by reason of any medically determinable physical or mental impairment(s)** which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. (Emphasis added). 42 USCS § 423.

The SSA included in its report an assessment of Plaintiff's cognitive deficits and reached the conclusion that not only was Plaintiff disabled from his own occupation, but that he was

**disabled from any substantial gainful activity**. The Disability Determination Explanation stated in part,

> Does the individual have sustained concentration and persistence limitations? **Yes.**
>
> The ability to carry out detailed instructions. **Moderately limited.**
>
> The ability to maintain attention and concentration for extended periods. **Moderately limited.**
>
> The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. **Moderately limited.**
>
> PERSONALIZED DISABILITY EXPLANATION
> We have determined that your condition is severe and results in a finding of disability.
> ECF 22-2, PageID.596-99.

On January 25, 2019, a Vocational Rehabilitation Evaluation was completed by Dr. Robert Ancell, who reviewed Plaintiff's physical and cognitive functional abilities and explained how they related to his potential for engaging in full-time work. Dr. Ancell's report stated in part,

> In addition to the previously mentioned symptoms, he has cognitive issues, significant concentration, focus, and irritability issues. Noise bothers him. **He has endurance problems and cannot stay at a task for a long period of time. He cannot multitask and he cannot remember what he reads. Mr. Fuhrman indicates that things have gotten worse over time. In 2017, he tried to return to work, but could not perform the duties and needed to go to his supervisor on a number of occasions because he was lost.** In addition to doing the accounting issues, he had to attend meetings, [and] assist in presentation[s]. He essentially worked under two bosses. **He indicates that all of his performance reviews for all of the years except 2017 were good. In 2017, he was given a verbal warning because he left early and did not complete a task.** His job titles included Financial Analyst, Cost Accounting and Auditing. His condition as it relates to his headaches is worse.
>
> His limitations include inability to work, do the church books, or to ride a bicycle. He doesn't work in the yard. He doesn't go for long walks. Being in a car for more than two and a half hours increases his symptoms. His wife and I spoke and she indicated that the quality of his life has gone down significantly. Things are extremely negative. These strokes have taken a lot out of him. He called me back, the next day on January 17, 2019, indicating that he forgot to tell me that he does drive on a very limited basis, but it bothers his head, specifically the stimuli. **He gets head tingling when he tries to focus. He has problems balancing his checkbook and matching up bills to checks. He can only do this for a short cycle. He has major issues with concentration, focus and multitasking.** * * *
>
> An occupational analysis done by a Mutual of Omaha [Certified Rehabilitation Counselor] classified him as a consultant. They used the [Enhanced Dictionary of Occupational

Titles], which is a non-peer reviewed database. They indicated that this was essentially a sedentary job. Unfortunately, they did not report the cognitive requirements of the job, which really related to the disability issues at hand. * * *

A form filled out by the Director of Finance and Planning for his employer SAF-Holland noted that he was a Business Unit Financial Analyst… The physical demands of the job were constant use of a computer, relating to others, written and verbal communication, reasoning, math and language and independent judgment. He was required to travel. About 5% of the time, he would go to plants in Ohio, Arkansas, Texas and Missouri. The physical demands of the job were standing 1/3 of the day, walking 1/3 of the day, sitting continuously. * * *

When one analyzes his job responsibilities according to the [Occupational Information Network], one finds for Cost Estimators, the importance of higher level functioning such as inductive reasoning on a scale of 0 to 100 is 75. In terms of work activities, the importance of interacting with computers is 93, getting information 90, analyzing data information 88, processing information 83, estimating the qualifiable characteristics of products, events and information 82, communicating with supervisors, and peers 81. Making decision[s] and solving problems 78.

As it relates to the aspect of the job of Financial Analyst, again the higher level cognitive functioning such as analyzing data and information is 96, processing information 96, making decision[s] and solving problems 88. Estimating the qualifiable characteristics of products, events and information 81. Thinking creatively 73. Interpreting the meaning of information for others 73.

As it relates to the position Auditor, again when one looks at the higher level cognitive functioning issues, one finds that active listening is 75, critical thinking 72, complete problem solving 68, deductive reasoning 75, inductive reasoning 72, evaluating information to determine compliance with standards 94, communicating with supervisors 91, updating and using relevant information 91. Analyzing data information 83, processing information 83.

…Mr. Fuhrman indicates that he has not been released by any of his treating doctors to return to work. **He also indicates that because of his higher level cognitive challenges, inability to do simple tasks relative to his own accounting personally, his inability to do the church books, which were much more simplified than for SAF, his significant fatigue, inability to multitask, his low frustration tolerance, endurance issues, concentration and focus, there are absolutely no jobs that exist that Mr. Fuhrman can perform.** (Emphasis added.) ECF 22-2, PageID.721-36.

On February 28, 2019, Plaintiff's attending physician, Dr. Matthew Powell, drafted and signed a Physician Statement of Disability, stating in part,

Mr. Fuhrman has ongoing complaints of a tingling sensation in his brain/skull, which then leads to the feeling of exhaustion and distraction. Mr. Fuhrman has complaints of numbness and tingling in his left arm, left shoulder, left thumb, middle and ring fingers and toes. He has further complaints of feeling like he is in a mental fog, struggles with decision making and fatigue, which then results in feelings of stress and irritability. Mr. Fuhrman experiences anxiousness, has sleep difficulties and dizziness.

**I have seen Mr. Fuhrman multiple times in a clinical setting and it is my medical opinion that he is totally and permanently disabled from his own occupation as a**

**Business Unit Financial Analyst and from any and all full time occupations at this time.** (Emphasis added.) ECF 22-5, PageID.1253-54.

On February 28, 2019, the undersigned submitted an appeal of the denial of Plaintiff's claim for LTD and LWOP benefits, providing additional medical records, as well as the above-referenced Vocational Rehabilitation Evaluation from Dr. Ancell, and the Physician Statement of Disability from Dr. Powell. (Administrative Appeal, at ECF 22-15, PageID.2363-2421; Attachments 1 – 27, at PageID.2422-3182).

On April 2, 2019, Defendant finally hired a physician, but only to perform a paper medical record review by neurologist Dr. David Burke, who therefore neither examined nor communicated with Plaintiff, nor did he speak with any of Plaintiff's treating physicians. ECF 22-19, PageID.3792-3805. In fact, from the record it appears that insurance company employees are the only humans Dr. Burke communicated with prior to formulating his opinions. Not surprisingly, Dr Burke opined that, because Plaintiff was physically capable of performing in a sedentary position, and while challenging the **credibility** of Plaintiff's medical complaints and Dr. Powell's medical assessment, found that Plaintiff was therefore not restricted in any manner from performing his job as a Financial Analyst.

On April 15, 2019, Defendant obtained a second paper record review, this time by a psychiatrist, Dr. Mark Schroeder, and although Dr. Schroeder was tasked with assessing Plaintiff's mental capabilities, he also never actually spoke with or completed an in-person assessment of Plaintiff.[3] ECF 22-5, PageID.1436-1444. Worse, Dr. Schroeder did not even

---

[3] According to the American Psychiatric Association's Principles of Medical Ethics, Section 7(3) states that "it is unethical for a psychiatrist to offer a professional opinion unless he or she has conducted an examination and has been granted proper authorization for such a statement." https://www.psychiatry.org/psychiatrists/practice/ethics. Additionally, in the American Psychological Association's Ethical Principals of Psychologists and Code of Conduct, Section 9.01, Bases for Assessments, subsection (b) states that "Except as noted in 9.01c, psychologists provide opinions of the psychological characteristics of individuals only after they have conducted an examination of the individuals adequate to support their statements or conclusions. When, despite reasonable efforts, such an examination is not practical, psychologists document the efforts they made and the result of those efforts, clarify the

attempt to compare Plaintiff's reported deficits to the vocational requirements of his position, or so much as acknowledge the definition of disability at issue in this matter. Dr. Schroeder's report of course concluded that he did not support a psychiatric functional impairment. *Id.* at 1440. However, to get to this conclusion, Dr. Schroeder imposed phony requirements for disability that are not part of the LTD or LWOP Plans, such as Plaintiff not participating in intensive mental health treatment, nor having a documented impairment of an inability to perform daily activities due to a psychiatric disorder. *Id.*

In May 2019, the undersigned submitted additional documentation to Defendant as part of the administrative appeal, including additional office visit notes from Dr. Powell (ECF 22-5, PageID.1425-31), "patient portal notes" as submitted from Plaintiff to his physicians (ECF 22-19, PageID.3733-34), and Plaintiff's Social Security Administration Claim File (ECF 22-1, PageID.176-613).

On June 17, 2019, Defendant advised that it was upholding its decision to deny Plaintiff's appeal of Defendant's decision to deny LTD benefits. ECF 22-1, PageID.161-169. The decision was based heavily on the paper reviews completed by its two doctors *Id.* Defendant's letter concluded that LTD benefits were being denied in part due to the following reasons,

> Beyond February 16, 2018, Mr. Fuhrman's reports of cognitive deficits are out of proportion to and inconsistent with the March 28, 2018, neuropsychological evaluation which revealed mild overall reduction in the efficiency of cognitive process, but, in most areas his cognitive functioning was within normal limits. * * *
>
> We appreciate the opinions of Mr. Fuhrman's treating providers; however, his medical records do not support impairment that would prevent him from working at his occupation of Financial Analyst due to the above stated reasons.
>
> Although Mr. Fuhrman has been awarded SSD benefits, the SS decision took into consideration his age when making their determination. SS also opined Mr. Fuhrman is limited to unskilled work due to his impairments but he has light sustained work capacity. We have considered all information in file, including the Disability Determination

probable impact of their limited information on the reliability and validity of their opinions, and appropriately limit the nature and extent of their conclusions or recommendations. https://www.apa.org/ethics/code/ethics-code-2017.pdf.

> Examination and Analysis of Evidence provided by the SSA. However, our review of the information does not support restrictions and limitations that would prevent him from working at his occupation. *Id.* at 166.

On June 17, 2019, Defendant also advised that it was upholding its decision to deny Plaintiff's appeal of Defendant's decision to deny LWOP benefits. ECF 22-19, PageID.3702-3707. Defendant's explanation letter was essentially identical to the explanation letter regarding the denial of LTD benefits.

According to the terms of the LTD Plan, Plaintiff's period for potential LTD benefits under the "Regular Occupation" definition of disability would have started on June 18, 2018 and continued for 24 months, until June 17, 2020. If approved for LTD benefits under the "Any Gainful Occupation" definition of disability, LTD benefits would be available until Plaintiff's 67th birthday, September 29, 2030. According to the terms of the LWOP Plan, Plaintiff's LWOP benefits would have started on September 18, 2018, and could have also potentially extended until September 29, 2030.

## STANDARD OF REVIEW

The first substantive question that must be addressed in an ERISA case regarding a decision as to whether or not to grant or deny employee welfare benefits is which standard of review the courts will apply to that decision. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989), the United States Supreme Court indicated that ERISA cases are ordinarily reviewed in the courts *de novo*, unless the involved benefits plan or insurance policy contains a clear grant of discretionary authority to the deciding entity, in which case an "arbitrary and capricious" review standard applies. Where the ordinary *de novo* standard applies, the role of the reviewing court is to determine whether the denial of benefits was an "objectively correct" decision, with that decision afforded no deference or presumption of correctness. *Perry v. Simplicity Engineering,* 900 F.2d 963, (6th Cir. 1990). In turn, where the arbitrary and capricious standard

applies, the reviewing court will generally grant some deference to the claim reviewer's decision if it has a reasoned explanation based on the evidence. *Marquette General Hospital v. Goodman Forest Industries,* 315 F.3d 629, 632 (6th Cir. 2002).

Effective March 1, 2007, the State of Michigan's Office of Financial Services promulgated binding rules in the Michigan Administrative Code providing that after April 1, 2007, "a discretionary clause" included in a policy of insurance provided in Michigan "is void and of no effect". Mich. Admin. Code R 500.2202. The 6th Circuit of Appeals has also ratified Michigan's discretionary clause ban as binding, ruling that it falls "within the ambit of ERISA's savings clause" and is "not preempted by that statute". *American Counsel of Life Insurers v. Ross*, 558 F.3d 600, 609 (6th Cir. 2009). The policy at issue has an effective date of January 1, 2010. Furthermore, on April 13, 2007, the United of Omaha Life Insurance Company signed certification and agreed to remove discretionary clauses from their policies. ECF 22-15, PageID.2450. Therefore, the proper standard of review in this case is the ordinary *de novo* standard applicable to ERISA cases, where no deference is afforded by this Court to the benefits denial decision reached by Defendant during the administrative process.

## ANALYSIS

### I.    Plaintiff Fulfilled the Requirements for Disability Under the LTD Plan.

The requirements to qualify as "disabled" under the LTD Plan during the Elimination Period and the Regular Occupation period are straightforward. Simply, Plaintiff must demonstrate that he:

- **Suffered from an injury or sickness;**
  (e.g. stroke, occluded carotid arteries, and associated mental functional capacity symptoms)

- **The injury or sickness caused a significant change in his mental or physical functional capacity;** (e.g. inability to focus, multitask, or concentrate for prolonged periods, reduced efficiency in cognitive processes, difficulty with personal finances)

- **The injury or sickness prevented him from performing at least one of the material duties of his regular occupation on either a full or part-time basis; and** (e.g. prevented from performing all material duties for extended periods, which prevents Plaintiff from maintaining a full-time occupation)

- **The injury or sickness also prevented him from generating more than 99% of his basic monthly earnings.** (e.g. the inability to maintain full-time work prevents Plaintiff from generating 99% of his basic monthly earnings).

As long as Plaintiff can demonstrate that his cognitive functional capacity declined such that it prevented him from performing his job as a Financial Analyst, and he was unable to work full-time and earn more than 99% of his prior monthly earnings, then he qualifies for LTD benefits. Further, the LTD Plan does not include any of the additional requirements Defendant attempts to impose, such as a severe cognitive impairment that incapacitates Plaintiff so significantly that he is unable to complete basic activities of daily living. In reality, Plaintiff is certainly capable of performing activities of daily living such as bathing and dressing himself. However, to suggest that this somehow translates to an ability to perform the highly technical duties of his occupation as a Financial Analyst is a bridge too far. Plaintiff's cognitive capacity quickly begins to fail, as is well-documented by his treating physician and vocational expert Dr. Ancell, when subjected to full time work, especially that of a Financial Analyst. Furthermore, the additional anxiety he experiences from the recognition of his poor performance causes significant frustration, which only exacerbates his inability to perform. Again, Dr. Powell clearly documents these issues as the basis for his conclusion that Plaintiff is totally disabled at this time (similarly well-documented by the Social Security Administration and Dr. Ancell). Considering Plaintiff not only experienced a stroke, but that he continues to have only one partially-blocked carotid artery providing blood to his brain, should Plaintiff's struggles really be that hard to believe? Moreover, he also has the support of all physicians and professionals who have actually treated him and counseled him in-person.

Finally, should Defendant wish to argue the issue of whether Plaintiff experienced a "significant change" in his cognitive capacity, the "change" only has to be significant enough to show that previously Plaintiff was capable of performing his regular occupation, and now he is not. Defendant has asserted the "significant change" phrase in past litigation in an effort to add additional requirements to its LTD plans, arguing that the change must be a sudden change that happens at a specific time. However, this argument was soundly rejected in one of Defendant's recent cases in the Eastern District of Michigan, herein the court stated in its opinion granting summary judgment to the plaintiff, "there is no language in the Plan suggesting that the "significant change" must happen instantly instead of gradually, and Defendant may not read this additional requirement into the text." *Counts v United of Omaha Life Ins Co*, 429 F Supp 3d 389, 402 (ED Mich, 2019). In the instant case, Plaintiff's cognitive functional capacity was quite suddenly impacted when he suffered a stroke. The full extent of that damage may have been realized over the following months and, to some degree, clouded by the intervening back injury he suffered, but that does not mean the change was any less sudden or significant.

## II.    Plaintiff Fulfilled the Requirements for Total Disability Under the LWOP Plan.

The requirements to qualify as "totally disabled" under the LWOP Plan are also straightforward. Plaintiff must demonstrate that because of injury or sickness he is completely and continuously unable to perform any work or engage in any occupation. Because of the nature of Plaintiff's disability, and his inability to engage in any type of task for extended periods of time, he also qualifies for LWOP benefits under the terms defined by the LWOP Plan. As summarized by Dr. Robert Ancell, "because of [Plaintiff's] higher level cognitive challenges, inability to do simple tasks relative to his own accounting personally, his inability to do the church books, which were much more simplified than for SAF, his significant fatigue, inability

to multitask, his low frustration tolerance, endurance issues, concentration and focus, **there are absolutely no jobs that exist that [Plaintiff] can perform.**" (Emphasis added). ECF 22-2, PageID.721-36. This opinion was also confirmed by Dr. Matthew Powell, who stated that "it is my medical opinion that [Plaintiff] is totally and permanently disabled from his own occupation as a Business Unit Financial Analyst **and from any and all full time occupations at this time**. (Emphasis added). ECF 22-5, PageID.1253-54.

### III.    Defendant's Decision to Ignore the Opinions of Plaintiff's Attending Physicians in Favor of Paper Record Reviews Was Improper.

The issue of the comparative merits of the opinions of treating physicians versus hired records reviewers has previously been addressed by the 6th Circuit. In *Hoover v. Provident Life and Accident Ins. Co.,* 290 F.3d 801, (6th Cir. 2002), the Court explained that a mere records review by an insurer's paid consulting physician, standing alone, is inadequate to support a benefits denial, "*[t]he evidence presented in the administrative record did not support the denial of benefits, where only Provident's physicians, which had not examined Hoover, disagreed with the treating physicians.*" *Hoover*, at 809. The effect of *Hoover* is that the opinions of treating physicians will ordinarily outweigh the contrary opinions of physicians who have merely undertaken a "cold" review of the medical file and have not examined the claimant. Also, a plan may not "*completely ignore favorable evidence from [a claimant's] treating physicians*" or "*reject summarily the opinions of a treating physician but must instead give reasons for adopting an alternative opinion.*" *Shaw v. AT & T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 548-49 (6th Cir. 2015).

When the disability is caused by cognitive decline (or mental and nervous disorders), the 6th Circuit has made clear that record reviews are most questionable. In a case on all fours with the instant case, the plaintiff was a software engineer, and due to severe back pain, he was

19

disabled from performing his job due to the cognitive decline secondary to pain. The 6th Circuit stated:

> First, file reviews are questionable as a basis for identifying whether an individual is disabled by mental illness. *See Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 505-09 (6th Cir. 2008) (noting that "[c]ourts discount the opinions of psychiatrists who have never seen the patient for obvious reasons"). Second, reliance on a file review is inappropriate where a claims administrator disputes the credibility of a claimant's complaints. *See Evans v. Unum Provident Corp.*, 434 F.3d 866, 878 (6th Cir. 2006) ("Where . . . conclusions from [a file] review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate."). *Javery v Lucent Technologies, Inc Long Term Disability Plan for Mgt or LBA Emples*, 741 F3d 686, 702 (6th Cir. 2014).

In the instant case, Defendant has wholesale ignored the records from Plaintiff's treating physicians and has done so in favor of two record reviewers, one a neurologist and the other a psychiatrist, where neither reviewer interacted with Plaintiff in any manner to assess his cognitive capabilities. A recent opinion from this Honorable Court explained further that when credibility is at issue, it is incumbent upon the paper reviewers to explain the basis upon which they challenge the credibility of the claimant and his treating physicians, stating as follows:

> While insurers may ordinarily rely on a file review, when the file reviewer's conclusion necessarily rely on a credibility determination, as which occurred here, "reliance on such a review may be inadequate." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 297 n.6 (6th Cir. 2005); see *Bennett v. Kemper Nat'l Servs.*, Inc., 514 F.3d 547, 555 (6th Cir. 2008) ("Further, we will not credit a file review to the extent that it relies on adverse credibility findings when the files do not state that there is a reason to doubt the applicant's credibility."). *Tiedel v. Reliance Std. Life Ins. Co.*, ___F Supp 3d___; 2020 U.S. Dist. LEXIS 65982, at *24 (WD Mich, Apr. 15, 2020).

At no point within the Administrative Record do any of Plaintiff's treating physicians raise issues of doubt, malingering, or questions of credibility as to the authenticity of Plaintiff's complaints.

### A. **Dr. David Burke**

The first record review in question was completed by Dr. David Burke. As part of his report, Dr. Burke stated,

> Therefore in taking into consideration the objective medical evidence, Dr. Powell's and Dr. Goshgarian's recommended activity limitations and the claimant's own self reported

activity; the claimant has the functional capacity for at least Light Level work activity…
ECF 22-19, PageID.3802.

However, this statement is based on Plaintiff's physical functionality. When it comes to Plaintiff's actual disability, his inability to perform complex mental tasks for prolonged periods of time, Dr. Burke is completely dismissive of Plaintiff's complaints and Dr. Powell's assessment that Plaintiff is totally disabled from work, stating, "*I have given little weight to this type of restriction, primarily because Dr. Powell's [office visit notes] document unremarkable physical and mental status examination findings, which are devoid of evidence of physical or cognitive limitations that would preclude the claimant from all work activity*". *Id.* at 3803. In doing so, Dr. Burke ignores the fact that Plaintiff has been pursuing medical treatment for his conditions for more than a year, has seen multiple physicians and other professionals in pursuit of relief, and has undergone various diagnostic testing such as MRIs and CT Scans. ECF 22-16, PageID.2581-2759; ECF 22-17, PageID.2760-3018; ECF 22-18, PageID.3019-3113; and ECF 22-18, PageID.3124-3177. This type of result-oriented analysis towards the records of treating physicians is exactly what the 6th Circuit has warned against and is not a sufficient basis to deny benefits. Further, it is worth noting that at no time did Defendant request a mental status examination or inform Plaintiff that it was required to document his claim. Even after Defendant was well aware that this claim was based on cognitive issues, it did not send Dr. Powell a cognitive form to fill out or request serial mental status examinations, instead choosing to only raise the issue in a paper review after the fact.

Furthermore, Dr. Burke also directly attacks the credibility of Plaintiff, stating affirmatively that he believes there is "*evidence of symptom magnification, exaggeration, or secondary gain*". *Id.* at 3804. Since Dr. Burke did not complete an in-person assessment of Plaintiff, he bases his credibility attacks on Plaintiff's own self-reported activity of "*attending*

*sleep away camp with his daughter for 1 week where they did chores, doing household chores, disability paperwork, insurance work, raking leaves, cleaning drains, and going to church/Sunday School and going to dinner at his In-laws*". *Id.* at 3801. Although Plaintiff is capable of being physically active for short periods of time, this type of activity does not somehow prove that Plaintiff has the mental capacity and stamina of performing all of the material duties of a highly-skilled and highly technical occupation for 8-hours a day, 5-days a week. "Moreover, a claimant's documented limitations may not simply be dismissed as being "subjective exaggerations," particularly where—as here—the individuals purporting to make that credibility determination did not meet or examine the claimant." *Calvert,* at 296-97.

### B.    Dr. Mark Schroeder

The second record review was completed by Dr. Mark Schroeder. As part of his report, Dr. Schroeder concluded,

> In summary, I concluded that the available evidence did not support psychiatric functional impairment requiring work restrictions/limitations during the timeframe in question, by means of significant abnormalities of the mental status examination, results of neuropsychological testing supporting impairment, documented impairment of the claimant's ability to perform normal daily activities due to a psychiatric disorder, or by participation in intensive mental health treatment.

However, in coming to this conclusion Dr. Schroeder has imposed requirements into the definition of disability that simply do not exist as defined by either the LTD Plan or LWOP Plan. At no point within his report does Dr. Schroeder consider the definitions of disability, nor the requirements of Plaintiff's position as a Financial Analyst, in order to make a relevant assessment of whether or not Plaintiff has the mental capacity and stamina to perform his position on a full-time basis.

Although Dr. Schroeder did not speak with Plaintiff, he did speak with his counselor, Cheryl Kallio, MA, and reported in part about their conversation,

Psychotherapist Ms. Kallio noted that the claimant reported experiencing depression, discouragement, frustration, lack of stamina, and "brain tingling" headaches. The claimant reported that he was able to perform only very limited daily activities because of these symptoms. It is important to consider an individual's self-reported symptoms and difficulties. However, when disability benefits are at stake, it is important to corroborate these with other clinical information. I concluded that the totality of the clinical information, including observed findings, did not support psychiatric impairment requiring work restrictions or limitations during the timeframe in question.

Ms. Kallio noted that the claimant reported depressive thoughts, but the rest of the observed mental status examinations were described as intact. Ms. Kallio did not administer psychological or neuropsychological tests with validity scales. Ms. Kallio stated that the claimant did not continue mental health treatment after 12/17/18, and the record does not document that he had been treated in a higher level of mental health treatment such as a partial hospital program. I concluded that the available evidence did not support the claimant's report of severe psychiatric functional impairment, by means of severe mental status abnormalities, neuropsychological test results with validity scales, or participation in intensive mental health treatment. ECF 22-5, PageID.1443.

Dr. Schroeder once again is completely dismissive of Plaintiff's consistent well-documented reporting his symptoms, as well as Ms. Kallio's assessment of Plaintiff in a clinical setting. Instead, by challenging Plaintiff's credibility and importing fictitious requirements that Plaintiff must fulfill in order to be considered disabled, such as a "severe psychiatric functional impairment" and "participation in intensive mental health treatment" Dr. Schroeder managed to complete the task of "diagnosing" the person discussed in the papers he reviewed as fit to return to work.

Again, the 6th Circuit provides guidance:

Plaintiff submitted medical evidence from numerous doctors and therapists who directly treated or examined him and concluded that he was unable to work due to a combination of his physical and mental conditions. He visited over a dozen medical experts. Those doctors who knew him best concluded, unequivocally, that he was unable to work at the relevant time. Defendant offers little to contradict this evidence. Accordingly, Plaintiff is entitled to disability benefits for the relevant period. *Javery*, at 702.

The same circumstances apply in this case, and this Court should also overturn Defendant's decision to deny benefits.

## IV.    Defendant Failed to Give Proper Weight to the Social Security Administration's Finding of Total Disability.

In Defendant's final decision letter denying LTD benefits, it largely ignored the SSA's

determination that the Plaintiff is totally disabled stating:

> Although Mr. Fuhrman has been awarded SSD benefits, the SS decision took into consideration his age when making their determination. SS also opined Mr. Fuhrman is limited to unskilled work due to his impairments but he has light sustained work capacity. We have considered all information in file, including the Disability Determination Examination and Analysis of Evidence provided by the SSA. However, our review of the information does not support restrictions and limitations that would prevent him from working at his occupation. ECF 22-1, PageID.166; ECF 22-19.

Although it is true that the SSA considered Plaintiff's age in reaching a decision for total disability the significance is lacking. In other words, a statement recognizing this factual distinction without explaining why it is significant renders the statement meaningless. Further, one could (and should) argue that the ripe old age of 57 would seem to put Plaintiff in his prime working years especially considering the Defendant's determination that a Financial Analyst is physically sedentary, but obviously mentally challenging. Worse still, the Defendant ignores the fact that the definition of total disability under the SSA rules is much more stringent than the definition at issue here because it required Plaintiff to be disabled from "any substantial gainful activity" verses simply being disabled from performing "at least one" of the material duties of his own occupation as a Financial Analyst.

Finally, as part of the SSA's process for approving an individual for SSD benefits, the person's age is only considered after they have already been deemed disabled from their own regular occupation and are being considered for total disability under the "substantial gainful activity" requirement. The Seventh District Court has described the SSA's process as follows:

> The first inquiry under the sequence concerns whether a claimant is currently engaged in substantial gainful employment. If it is found that he is, the claim is denied without reference to the other steps in the sequence. If he is not, the second inquiry is whether the claimant has a "severe" impairment. If he does not, the claim is denied. If a severe impairment is present, the third inquiry is whether such impairment meets or equals one of the impairments listed under Appendix I of Subpart P of the Administrative Regulations No. 4. If it does, the claim is approved. If it does not, the fourth inquiry is whether the claimant's impairments prevent him from performing his past relevant work. **If he is found to be capable of returning to his past relevant work, the claim is denied. If he is not found to be so capable, the fifth and final inquiry is whether claimant is able to perform other forms of substantial gainful activity, considering his age,**

**education and prior work experience. If he is not, the claim is approved.** *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). (Emphasis added).

The Defendant understood that it must consider the favorable SSD determination, however, it appears they did nothing more than acknowledge it and discard it, just as they did when they made adverse credibility determinations from afar and largely ignored the consistent observations and opinions of Plaintiff's treating physicians.

## V.    Defendant Failed to Properly Investigate the Claim.

A recent unpublished decision from the 6th Circuit further addresses evaluating the providence of an insurance company's decision to deny benefits without the benefit of conducting an in-person evaluation:

> The failure to conduct a physical examination, where the ERISA plan document gave the plan administrator the right to do so, raises questions about the thoroughness and accuracy of the benefits determination. In particular, when an employee contends that she is disabled by chronic pain, and the relevant ERISA plan gives the administrator right to physically examine the employee, a plan administrator's decision to discount those complaints of pain without conducting a physical examination weighs in favor of a determination that the denial of the employee's claim was arbitrary and capricious. **While it is true that there is nothing inherently objectionable about a file review by a qualified physician, courts have repeatedly cautioned that plan administrators should not make credibility determinations concerning the patient's subjective complaints without the benefit of a physical examination.** Emphasis added. *Guest-Marcotte v Life Ins. Co. of North America*, 730 F App'x 292, 293 (6th Cir. 2018). (**Exhibit 1**).

In the instant case, Defendant had the right to request an in person medical evaluation (ECF 22-1, PageID.120), but it simply chose not to do so. Defendant was clearly challenging Plaintiff's credibility, as well as the credibility of his supporting physicians, and yet it still failed to request an actual examination of him. This is further evidence of Defendant's failure to properly and fairly investigate the claim.

## VI.   Defendant Failed to Consider the Work Skills and Income Requirements Necessary to Satisfy the Definition of Disability Within the LTD Plan.

Plaintiff was previously a hardworking professional in an intellectually demanding position. As Plaintiff reported to Dr. Robert Ancell, he attempted to return to work in early 2017

following his stroke, however his symptoms continued, and his job performance was suffering.

Dr. Ancell noted:

> Mr. Fuhrman indicates that things have gotten worse over time. In 2017, he tried to return to work, but could not perform the duties and needed to go to his supervisor on a number of occasions because he was lost… He indicates that all of his performance reviews for all of the years except 2017 were good. ECF 22-2, PageID.722.

Defendant's denial of the LTD claim during the Elimination Period failed to consider both his occupational requirements and the income requirements included in the LTD Plan as part of the "Regular Occupation" definition of disability (see Pg. 7 above). Simply put, the nature of Plaintiff's disability prevents him from effectively and reliably performing the duties his own occupation as a Financial Analyst, or any other position in a full-time capacity. This analysis is simply absent from Defendant's denial and explanation for limiting Plaintiff's disability status through February 16, 2018, when Plaintiff was released to return to work by Dr. Moulton on the basis of recovery from his back injury. ECF 22-18, PageID.3210-21; ECF 22-1, PageID.161-169.

The LTD Plan also requires that Plaintiff must be able to "generate Current Earnings which exceed 99% of Your Basic Monthly Earnings". ECF 22-1, PageID.124. If Plaintiff took even one afternoon off per month due to his disability, he would already be under the 99% threshold. However, Defendant never addresses this provision of the LTD Plan, likely because it would highlight the "low bar" to initially qualify for benefits under the subject benefit Plan.

The 6th Circuit addressed this type of willful ignorance in *Elliott v Metro Life Ins. Co.*, 473 F3d 613, (6th Cir. 2006), where the court explained:

> We must now ask whether MetLife made a reasoned judgment that Elliott's medical condition allowed her to perform those or similar duties. Logically, MetLife could have made a reasoned judgment only if it relied on medical evidence that assessed Elliott's physical ability to perform job-related tasks. *McDonald*, 347 F.3d at 172 (citing *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998) (The plan "was under a duty to make a reasonable inquiry into the types of skills [the claimant] possesses and whether those skills may be used at another job."))… **Put differently, medical data, without reasoning, cannot produce a logical judgment about a claimant's work ability. Despite the numerous medical evaluations that took place in this case, MetLife did not rely on an application of the relevant evidence to the occupational**

**standard when it denied her claim initially and on internal appeal.** *Elliott v Metro Life Ins. Co.,* 473 F3d 613, 618 (6th Cir. 2006). (Emphasis added).

The subject Plan only requires Plaintiff be prevented from performing ONE material duty of a Financial Analyst. Defendant cannot demonstrate that Plaintiff's complaints and the opinions of his treating physicians were ever considered or comparatively analyzed against the job requirements of a Financial Analyst.

## <u>CONCLUSION AND RELIEF</u>

For the foregoing reasons, Plaintiff Charles Fuhrman respectfully requests that this Court overturn Defendant's denial of LTD and LWOP benefits, and retroactively award the LTD and LWOP benefits, along with interest, costs, and reasonable attorney fees as provided by law.

Respectfully Submitted,

Dated:  September 28, 2020

/s/ *Troy W. Haney*
Troy W. Haney (P48614)
Attorney for Plaintiff
330 East Fulton
Grand Rapids, MI 49503
(616) 235-2300

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of W.D. Mich. LCivR 7.2(b)(ii) because, excluding the exempted parts, this document contains 9,627 words. This word count was generated using Microsoft Word 2008.

*/s/ Troy W. Haney*
Troy W. Haney